IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN RAFEAL TRINIDAD,<br>         Plaintiff,<br>-*against*-<br><br>ROMAN CATHOLIC DIOCESE OF BROOKLYN; OUR LADY OF MERCY CHAPEL; OUR LADY OF THE PRESENTATION – OUR LADY OF MERCY PARISH; and DOES 1 – 5 whose identities are unknown to Plaintiff,<br>         Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff, John Rafeal Trinidad, by and through his undersigned attorneys alleges the following for his Complaint:

**PARTIES**

1. Plaintiff, John Rafeal Trinidad, ("Plaintiff") is an adult male, who was sexually abused as a minor in the State of New York. Plaintiff resides in and is a citizen of the State of Utah, Salt Lake County. All or part of the abuse alleged herein occurred in the State of New York.

2. Defendant Roman Catholic Diocese of Brooklyn ("Diocese") was and continues to be a Roman Catholic organization and a non-profit religious corporation, duly organized and existing under, pursuant to, and by virtue of the laws of the State of New York, licensed to do and/or transact business within the State of New York, and with a principal place of business at 310 Prospect Park West, Brooklyn, New York 11215.[1]

---

[1] Unless otherwise stated, allegations herein are made regarding all times relevant to this action and believed to be true at all times relevant to this action.

3. Defendant Our Lady of Mercy Chapel was and continues to be a Roman Catholic organization and a non-profit religious corporation, duly organized and existing under, pursuant to, and by virtue of the laws of the State of New York, licensed to do and/or transact business within the State of New York, and with a principal place of business at 680 Mother Gaston Blvd, Brooklyn, New York 11212.

4. Defendant Our Lady of the Presentation – Our Lady of Mercy Parish was and continues to be a Roman Catholic organization and a non-profit religious corporation, duly organized and existing under, pursuant to, and by virtue of the laws of the State of New York, licensed to do and/or transact business within the State of New York, and with a principal place of business at 1677 St. Marks Ave., Brooklyn, New York 11233.

5. Hereinafter, Defendants Our Lady of Mercy Chapel and Our Lady of the Presentation – Our Lady of Mercy Parish will be referred to collectively as "Our Lady."

6. Defendants Does 1 – 5 are unknown agents whose identities will be provided when they become known pursuant to CPLR § 1024.

7. Hereinafter, the Diocese, Our Lady, and Does 1 – 5 will be referred to collectively as "Defendants."

8. Father Kenneth Wicks ("Perpetrator") was a Roman Catholic priest, counselor, and/or teacher, under the direct supervision, authority, employ, and control of the other Defendants at all times material hereto.

**JURISDICTION & VENUE**

9. This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332 because the suit is between citizens of different states and the amount in controversy exceeds $75,000.

10. This Court has jurisdiction over Defendants because, on information and belief, (a) Defendants have sufficient minimum contacts in New York, (b) Defendants are citizens of New York, (c) Defendants are authorized to do business in New York, and/or (d) Defendants are registered to do business in New York.

11. Venue is proper in this district pursuant 28 U.S.C. § 1391 (b)(2) because the events and omissions giving rise to the claims in this action occurred in Kings County, New York.

## STATUTE OF LIMITATIONS

12. Pursuant to the New York Child Victims Act (L 2019, ch. 11) (the "CVA"), a victim of childhood sexual abuse in the State of New York whose claim was barred by the statute of limitations is now revived. Such a claim must be brought not later than one year and six months after the CVA became law on February 14, 2019. See CPLR § 214-g. Plaintiff's claim is timely.

## FACTS & ALLEGATIONS COMMON TO ALL COUNTS

13. Plaintiff repeats, realleges, and incorporates the preceding paragraphs as if set forth at length herein.

14. In 1962, the Vatican in Rome issued a Papal Instruction, entitled *Crimen sollicitationis,* which acted as a company-wide memorandum of policy and procedure and was binding on all patriarchs, archbishops, bishops, and other local ordinaries across the world, which remained in effect until 2001. According to this instruction, allegations and reports of childhood sexual abuse, among other deviant behavior, by priests and/or religious members serving in their institutions were required to be kept secret within the confines of the Roman Catholic Church (the "Church" or the "Catholic Church"). Additionally, disclosure of such information to civil authorities, parishioners, and/or the public generally was forbidden.

15. Defendants' internal and mandated business policies and procedures require their high officials, agents and/or employees to keep any files or knowledge associated with an accused priest secret, known as the "secret of the Holy Office," and "under pain of incurring automatic excommunication."

16. Through the secret files and the procedures for movement and protection of pedophile priests, the Catholic Church as a whole, including the Defendants, developed detailed historical institutional knowledge regarding the prevalence of pedophile priests, their patterns of conduct, and the patterns of conduct used by the various Church institutions in solving individual priest problems in their own jurisdiction through movement and reassignment.

17. Because Defendants engaged in the same conduct with the pedophile priests and religious order members that they had to address, they knew what it may mean when, for example, a priest arrived from a different diocese, school and/or parish without some other clear, non-nefarious explanation for the move, or after having only spent a short time in the prior assignment.

18. Recently, the Office of the Attorney General of the Commonwealth of Pennsylvania released a Grand Jury Report (the "Report") consisting of over 800 pages and naming more than 300 members of the Roman Catholic clergy who were connected to and/or involved in sex crimes against children.[2]

19. The Report detailed how the dioceses of Pennsylvania, and its leaders "managed" the ongoing and known sexual abuse of children within the Church. The investigation detailed in the Report revealed and ultimately illustrated the implemented business practice and pattern uti-

---

[2] A downloadable PDF of Report I of the 40th Statewide Investigating Grand Jury, Office of the Attorney General, Commonwealth of Pennsylvania is available at: https://www.attorneygeneral.gov/report/ (last visited May 24, 2020).

lized throughout the Church worldwide that was instituted not to help children, but to avoid "scandal" (a word used directly by the Church in its documents regarding child sex abuse).

20. The pattern utilized by the Church generally, and Defendants herein specifically, in carrying out these policies and procedures was even susceptible to behavioral analysis by the Federal Bureau of Investigation. Special agents testified before the grand jury and identified a series of practices that regularly appeared in the Church files they analyzed:

a. First, Church officials, agents and employees make sure to use euphemisms when describing the sexual assaults in documents. For example, they never say "rape," but instead say "inappropriate contact" or "boundary issues."

b. Second, the Church does not conduct genuine investigations into the sexual abuse with properly trained personnel. Instead, they assign clergy members to ask inadequate questions, and then make credibility determinations about colleagues that they live and work with.

c. Third, after learning of inappropriate behavior by its agents and employees, the Church sends priests for "evaluation" at *church-run* psychiatric treatment centers. The Church allows its "experts" to "diagnose" whether the priest is a pedophile, based largely on the priest's "self-reports," and regardless of whether the priest had engaged in sexual contact with a child.

d. Fourth, when the Church does finally remove a priest, it does not explain why. Parishioners are given broad explanations such as "sick leave" or "suffering from "nervous exhaustion." Alternatively, the Church says nothing at all.

e. Fifth, even if a clergy member is raping children, the Church continues to provide him housing and living expenses, although he may be using these resources to facilitate more sexual assaults.

f. Sixth, if a predator's conduct becomes known to the community, the Church does not remove him from the priesthood to ensure no more children will be victimized. Instead, the Church transfers him to a new location where no one will know he is a child abuser.

g. Finally, the Church does not report this behavior to the police even though child sex abuse, even short of actual penetration, is and has been, for all times relevant, **a crime.** However, the Church does not treat it that way, and has decided to handle childhood sexual abuse like a personnel matter, "in house."

21. The Report further established a long history and pattern of child sex abuse by the Catholic clergy and religious order members, which was known, tolerated, and hidden by the Church, a pattern that repeats across all dioceses in the Church, including the Defendants herein, and additionally showed that Defendants tolerate and actively conceal the sexual abuse of children by its agents and employees for their own pecuniary benefit.

22. Despite these revelations, as well as many criminal and civil litigations the Church has been involved in as a result of clergy or religious order sexual abuse of minors, Church leaders continue to pursue the mandated policy of secrecy.

23. Refusal to disclose sexually abusive clerics to parishioners is just one way that Defendants maintain secrecy. Another has been to use various forms of persuasion on victims or their families to convince them to remain silent about the incidents of abuse. These forms of persuasion have included methods that have ranged from sympathetic attempts to gain silence to direct intimidation to various kinds of threats. In doing so, the Church members and leaders involved, from bishops to priests, have relied on their power to overwhelm victims and their families.

24. Upon information and belief, during all relevant periods Perpetrator was serving for, employed by, and/or acting in some capacity under the control and supervision of Defendants.

25. From approximately 1968 to 1970, when Plaintiff was approximately 13 years old to 15 years old and a parishioner and an altar server at Our Lady, Perpetrator engaged in unpermitted sexual contact with Plaintiff in violation of at least one section of New York Penal Law Article 130 and/or § 263.05, or a predecessor statute that prohibited such conduct at the time of the abuse.

26. Perpetrator sexually molested Plaintiff, while under the supervision and/or authority of the other Defendants, which failed to report Perpetrator and/or other priests to the criminal authorities; failed to urge Perpetrator's criminal prosecution; and/or failed to take any other action available and/or necessary to protect Catholic children in New York, or elsewhere, such as Plaintiff, from sexual and physical assault by Perpetrator.

27. Defendants were, and are, in a specialized position where they had knowledge that Plaintiff did not. Defendants were in a position to have this knowledge because they had authority over Perpetrator and acted as Perpetrator's employer, because Defendants were responsible for Perpetrator, and because their policies mandated and continue to mandate secrecy with respect to the sort of knowledge learned about Perpetrator.

28. Plaintiff, on the other hand, was a minor child. As a child, Plaintiff was not in a position to have information about Perpetrator's molestation of other children or Defendants' knowledge of the dangers that Perpetrator posed to children, nor was Plaintiff in a position to know that Defendants mandated that their employees keep such knowledge from others, including children like Plaintiff.

29. Defendants made representations regarding safety directly to Plaintiff's family, doing so with the knowledge and intent that they would be communicated to the minor Plaintiff through Plaintiff's parents/caregivers' words and actions. Defendants also had reason to believe that the representations made to Plaintiff's parents/caregivers would influence Plaintiff and particularly that the representations would influence the amount and type of time spent alone with Perpetrator, Perpetrator's access to Plaintiff, and his ability to molest Plaintiff.

30. Because of the authority, superiority, and influence that Defendants had, and continue to have, over his family, Plaintiff believed and relied upon these misrepresentations.

31. Beyond the information that Defendants knew, or should have known, about Perpetrator before Plaintiff was sexually abused, Defendants had opportunities to discover the sexual abuse of Plaintiff.

32. Defendants knew, or by the exercise of ordinary care should have known, what Perpetrator was doing to Plaintiff given the location of the abuse on Church grounds in addition to the potentially numerous opportunities any of Defendants' other employees or agents would have had to catch Perpetrator with other victims.

33. Defendants acts and omissions in failing to supervise Perpetrator, in failing to control Perpetrator's unfettered, private access to Plaintiff, in failing to investigate the private contact with Plaintiff, failing to warn Plaintiff before or during his tenure at Our Lady about Perpetrator, and their failure to report Perpetrator's behavior to the proper authorities, or *at a minimum,* to Plaintiff's parents, evidence a breach of even the most basic duty of ordinary care.

34. The failure to act on the abusive behavior and inappropriate boundary-breaking conduct by Perpetrator with minors before Plaintiff was sexually abused was willful, wanton and reckless.

35. Further, the Defendants' acts and omissions were taken to avoid Church scandal, and thereby, protect its membership numbers and donations.

36. Had Plaintiff, or Plaintiff's family, known what Defendants knew or should have known – that Perpetrator was a suspected child molester and a danger to children before Plaintiff was first molested by Perpetrator – Plaintiff would not have been sexually assaulted.

37. The acts and omissions of Defendants, as plead herein, represents conduct, which is willful, outrageous, reckless, and deliberately indifferent to the health, safety, and welfare of children in general and Plaintiff in particular.

38. Plaintiff was placed in the complete care of Defendants by, and/or consent of, his parents under their guise of religiosity of Defendants' instruction, institutions, agents, and employees. As a minor, Plaintiff was a person who would foreseeably be harmed by such acts and omissions described throughout this Complaint and below.

39. Defendants were responsible for assigning, transferring, and/or suspending all clergy members, including Perpetrator, to and from parishes within the dioceses of the State of New York.

40. Defendants, and Perpetrator acting as an agent and/or employee, solicited funds and support from their parishioners, students and others participating in Church-provided services through memberships, assessments, direct appeals, and/or tuition.

41. A special relationship and/or parish-parishioner relationship existed between Plaintiff and Defendants and their agents and/or employees as specifically described and/or identified herein, notably Perpetrator.

42. Defendants explicitly and implicitly represented to Plaintiff that each of their priests, including Perpetrator, were benevolent and trustworthy stewards of the Church who would only act in the best interests of the children whom they served.

43. Plaintiff entrusted his well-being to the Defendants who had corresponding obligation to be solicitous for, as well as protective of the Plaintiff in exercise of their positions of superiority and purported authority.

44. Defendants invited and encouraged Plaintiff, as a minor child, to accept each priest assigned to positions within the Church to be in good standing, including Perpetrator, as one who was worthy of and who had the responsibility for Plaintiff's physical and spiritual safety, thereby inducing Plaintiff to entrust himself to the company and care of Perpetrator and sub-

ject himself to the authority of and instructions from Perpetrator while on Defendants' property and/or in the accompaniment of Perpetrator.

45. Defendants' agents and/or employees as specifically described and/or identified in this Complaint, Perpetrator, and other employees of Defendants worked together as religious officers who were obligated to arrange, render, and coordinate the religious and educational care of the children enrolled in their institution, including those for Plaintiff which included oversight of and total responsibility for the protection, prevention of the acts of sexual, mental, and physical abuse by their clergy member Perpetrator and reporting their knowledge of the dangers of Perpetrator.

46. Defendants employed and/or held out as their agents and/or employees as specifically described and/or identified herein all employees implicit in the sexual abuse of Plaintiff by Perpetrator along with any other employee who was involved in the cover-up of the sexual abuse experienced by Plaintiff who were also acting within the course and scope of their respective employment, master-servant, and/or agency relationships with Defendants over whom it had direct control and/or a right of control and/or whose actions they ratified as the principals.

47. The employees discussed herein, including but not limited to, Perpetrator, were the agents and/or employees of Defendants, and acted within the course of employment and/or in the scope of his respective authority.

48. Any action and/or omission committed by any agent and/or employee of the Defendants and Perpetrator, along with any employee involved in the acts and omissions involved in the cover-up and sexual abuse of Plaintiff, imposes liability upon the Defendants under the laws of agency, *respondeat superior*, vicarious liability, master-servant, and right of control, in the State of New York.

49. Plaintiff, as a minor, relied on the religious and educational services provided by Defendants and their agents and/or employees as specifically described and/or identified herein, notably Perpetrator, and as described in detail in the "Facts" section of this Complaint. Nevertheless, Defendants collectively failed to provide Plaintiff with appropriate care and attention required by the necessary standard of care.

50. The acts and/or omissions of Defendants and their agents and/or employees as specifically described and/or identified herein, notably Perpetrator, was a factual cause of and/or placed Plaintiff at an increased risk of harm for and/or was a substantial factor in causing and/or caused the severe, permanent, incurable, and grievous injuries and damages described and/or identified herein, most notably the sexual abuse inflicted by Perpetrator, which is addressed in detail herein.

51. The severe, permanent, incurable, and grievous injuries described in the "Facts" section of this Complaint, which Plaintiff has suffered and continues to suffer were caused solely and exclusively by the conduct of Defendants and their agents and/or employees as specifically described and/or identified herein, notably Perpetrator, and were due in no manner whatsoever to any act or failure to act on the part of Plaintiff.

52. Further, the Defendants' actions were taken to avoid Church scandal, and thereby, protect its business, membership numbers, and donations.

53. As a proximate and direct result of the aforesaid willful, wanton, and reckless conduct of the Defendants, Plaintiff sustained the injuries and damages in an amount to be determined at trial.

54. That as a direct and proximate result of Defendants' acts, negligence, gross negligence, and conduct described herein, the Plaintiff sustained both physical and emotional injuries and suffered damages. Plaintiff's injuries and recoverable damages include the following:

   a. Conscious pain and suffering;

   b. Physical, psychological and financial injuries, physical injuries to Plaintiff's body, including, but not limited to, multiple bodily injuries, injuries suffered at the times of the sexual abuse, subsequent mental anxiety, anguish, shame, internal injuries, and other injuries;

   c. Severe past, present, and future mental anguish and trauma, necessitating psychiatric and medical care and treatment in the past, present, and/or future;

   d. Loss of faith and mistrust of the Church and its institutions;

   e. Physical ailments, including, but not limited to headaches, nausea, loss of sleep, and physical shock to the nervous system;

   f. Physical injuries to Plaintiff's body including, but not limited to, multiple bodily injuries, injuries suffered at the times of the sexual abuse, subsequent mental anxiety, anguish, shame, internal injuries, and other injuries;

   g. Grievous mental and bodily pain and suffering, mental anguish, emotional distress, inconvenience, loss of enjoyment of life, humiliation, embarrassment, loss of self-esteem, disgrace, guilt, and shame;

   h. Past, present, and future physical pain and suffering;

   i. Past, present, and future medical expenses;

   j. Past, present, and future lost wages, loss of earnings and earning capacity;

   k. Punitive damages;

   l. Exemplary damages;

   m. Litigation costs, expenses, and reasonable and necessary attorneys' fees; and,

   n. Any and all other damages to which Plaintiff may be justly entitled.

55. The amount of damages sought exceeds the jurisdiction of all lower courts which would otherwise have jurisdiction.

56. This action falls within exceptions to Article 16 of the CPLR.

## COUNT ONE – NEGLIGENCE

57. Plaintiff repeats, realleges, and incorporates the preceding paragraphs as if set forth at length herein.

58. At all times material hereto, pursuant to common law and Restatement (Second) of Agency § 219, Perpetrator was acting as the agent of the Defendants, because while engaging in the acts of grooming and abuse with Plaintiff, Perpetrator was in the course and scope of his respective employment with the Defendants and/or was able to accomplish the sexual abuse because of his job-created authority and role as an agent of Defendants.

59. To the extent it is found that Perpetrator was acting outside of the scope of his employment for some or all of the conduct described herein, pursuant to Restatement (Second) of Torts § 317, Defendants had a duty, as masters of Perpetrator, to exercise reasonable care to control Perpetrator while he was on Defendants' premises, even if acting outside the scope of his employment, to prevent Perpetrator from sexually abusing Plaintiff.

60. At all times material hereto, Defendants by and through their agents and employees, accepted responsibility for the well-being of Plaintiff, a minor child, while on the premises and/or engaged in activities involving Defendants' employees and agents.

61. Defendants had a duty to use reasonable care to protect Plaintiff from known and/or foreseeable risks of harm while they arranged, rendered, and coordinated the religious care of Plaintiff attending services at Our Lady, and/or participating in the activities provided by Defendants on premises like schooling, mass, and continuing Catholic education, amongst others.

62. Given the extensive understanding and experience the Church, at all levels, had with pedophilic priests, Defendants knew, or should have known, that unfettered, private contact between priests and minors engaged in activities that were at Church locations and/or Church-funded, represented an unreasonable risk of harm to these minors.

63. Perpetrator's actions were so similar to many other priests, Defendants, acting with any level of care and curiosity or concern, should have known what warning signs to look for in order to invite additional scrutiny over Perpetrator, including *inter alia*, his singling out of Plaintiff.

64. Defendants knew, or should have known, that Perpetrator spending time with Plaintiff would create an unreasonable risk of harm to Plaintiff.

65. Given the type of abuse and the location in which the abuse occurred, Defendants, if exhibiting any degree of care or curiosity, should have inquired further into the relationship Perpetrator had with Plaintiff to uncover the abuse—the very purpose of the "should have known" standard of care which Defendants breached in this case through their acts and omissions.

66. Defendants breached their duties described above by, *inter alia*:

   a. failing to recognize Perpetrator's pedophilic behaviors and the warning signs thereof;

   b. failing to recognize or discover Perpetrator's sexual abuse of Plaintiff during the individual instance wherein Perpetrator was able to have unfettered private access to Plaintiff to perform the acts described above;

   c. failing to exercise reasonable care to monitor the priest-parishioner relationship for signs of grooming and failing to take any steps to limit or prevent unfettered, private access by Perpetrator to Plaintiff, thereby providing him ample opportunity to sexually abuse Plaintiff;

   d. failing to implement policies and procedures that prevented child sexual abuse, rather than promoting secrecy;

  e. failing to use reasonable care to investigate Perpetrator after hiring him and/or assigning him to Our Lady to care for children; and

  f. failing to train employees and agents in the prevention and reporting of sexual abuse against minors.

67. Given Defendants' long-standing, mandated policies and procedures Defendants knew, or with the exercise of reasonable care should have known, before and/or during the pendency of Plaintiff's tenure at Our Lady, that Perpetrator had previously committed acts of sexual abuse against minors and was grooming and then sexually abusing Plaintiff.

68. On information and belief, Defendants are in the possession of documents, data, and/or personal knowledge regarding facts verifying the deviant sexual behavior and tendencies of Perpetrator from before and/or during the sexual abuse of Plaintiff.

69. The kind of conduct that Perpetrator engaged in was foreseeable specifically to these Defendants, at all times material hereto, based on the extensive and specialized knowledge and experience the Defendants had regarding the pedophile priest problem within the Church.

70. Defendants' acts and omissions constituted gross negligence as the breaches of their duty of care evidenced reckless disregard of the safety and welfare of Plaintiff and other innocent children where Defendant took no steps to control or stop Perpetrator despite abusing Plaintiff on Defendants' premises. Instead, Defendants sought to suppress the known and tolerated pedophile activities of their clergy members, including Perpetrator, through a failure to act, failure to warn, failure to investigate, and failure to report.

71. Defendants were more concerned with their reputation than protecting the aforementioned children, including Plaintiff. Such conduct engaged in by Defendants constitutes gross negligence as it was, and is, wanton and willful, and in reckless disregard of the safety of innocent children, including Plaintiff.

72. As a direct and proximate result of the Defendants' acts and omissions, and their agents, servants, workers, or employees' acts and omissions, Plaintiff suffered sexual abuse, as well as the ensuing physical, mental, psychological, economic and noneconomic injuries, and damages discussed herein, which Plaintiff still continues to suffer.

73. As a direct and proximate result of Defendants' acts and omissions discussed above, Plaintiff suffered significant injuries and damages in an amount to be proven at trial.

74. In addition to direct acts and omissions by Defendants constituting negligence as described above, Defendants are also vicariously liable for their agents, employees, and representatives' acts, including Perpetrator, under the doctrine of *respondeat superior*.

**WHEREFORE**, Plaintiff demands judgment against Defendants, on the above causes of action, in an amount to be determined at trial for a sum that will fully and fairly compensate Plaintiff for alleged injuries and damages; that Plaintiff recovers actual damages; that Plaintiff is entitled to recover compensatory damages; that Plaintiff recovers punitive damages; and for such other further relief; together with costs and disbursements of this action; and such other and further relief as the Court deems proper.

## COUNT TWO – NEGLIGENT RETENTION AND SUPERVISION

75. Plaintiff repeats, realleges, and incorporates the preceding paragraphs as if set forth at length herein.

76. Defendants were responsible for decisions relating to supervising, assigning, transferring, and/or suspending all clergy members, including Perpetrator, within their Roman Catholic institutions, including entities such as Our Lady.

77. At all times material hereto, Perpetrator was in an employer-employee relationship with Defendants when Perpetrator sexually abused Plaintiff.

78. Defendants failed to exercise reasonable care to control, supervise, train, and retain Perpetrator in a number of respects, including but not limited to:

   a. failure to use reasonable care to investigate Perpetrator prior to assignments at Church institutions, including Our Lady, at which he was to provide care for and teach minors;

   b. failure to train employees and agents, including Perpetrator, in the prevention and reporting of sexual abuse against minors;

   c. failure to supervise and control Perpetrator while he carried out his priestly assignments at Defendants' institutions, including Our Lady, and while at his Church-provided living accommodations; and

   d. failure to make reasonable decisions about whether or not to retain and/or report Perpetrator once Defendants knew of inappropriate acts and behavior committed by him.

79. Defendants' above-described business policies and procedures of concealing, and ultimately promoting, the widespread knowledge and acts of pedophilic tendencies of its clergy members provided Defendants with the actual and/or constructive knowledge that Perpetrator was engaged in this deviant behavior.

80. With the exercise of reasonable care, Defendants knew or should have known before and/or during the pendency of Perpetrator's tenure within their Church institutions, including Our Lady, that he was a risk to sexually abuse minor children like Plaintiff.

81. As a direct and proximate result of Defendants' negligent retention and supervision of Perpetrator as discussed above, Plaintiff suffered significant injuries and damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendants, on the above causes of action, in an amount to be determined at trial for a sum that will fully and fairly compensate Plaintiff for alleged injuries and damages; that Plaintiff recovers actual damages; that Plaintiff is entitled to recover compensatory damages; that Plaintiff recovers punitive damages; and for

such other further relief; together with costs and disbursements of this action; and such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury as to all issues.

                                                    **D'ARCY JOHNSON DAY, PC**

Dated: New York, New York      By:    */s/ Peter W. Smith*
         August 5, 2021                          Peter W. Smith
                                                             PWS@DJD.LAW
                                                             1501 Broadway, 12th Floor
                                                             New York, New York 10036
                                                             (866) 327-2952

| **MATTHEWS & ASSOCIATES** | **FREESE & GOSS** |
|---|---|
| David P. Matthews | Tim K. Goss |
| DMATTHEWS@THEMATTHEWSLAWFIRM.COM | TIM@FREESEANDGOSS.COM |
| Liza L. Roys* | Peter de la Cerda* |
| LROYS@THEMATTHEWSLAWFIRM.COM | PETER@FREESEANDGOSS.COM |
| 2905 Sackett St. | 3500 Maple Ave., Suite 1100 |
| Houston, Texas 77098 | Dallas, Texas 75219 |
| (713) 522-5250 | (214) 761-6610 |

*Attorneys and Co-counsel for Plaintiff*
*\* Texas counsel will be seeking pro hac vice admission.*